UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:                                                    Chapter 7

Select One, Inc.,                                         Case No. 12-45314
d/b/a Farm Fresh Market,
                                                          Hon. Phillip J. Shefferly
              Debtor.
_____/

Charles L. Wells, III, Chapter 7 Trustee of              Adversary Proceeding
Select One, Inc., d/b/a Farm Fresh Market,               No. 12-05664-PJS

              Plaintiff,

v.

Mike Salmo, a/k/a Mouayad Salmo, and
Market Fresh Grocery, Inc.,

              Defendants.
_____/


**TRIAL OPINION AVOIDING TRANSFER AND
AWARDING MONEY JUDGMENT**


**Introduction**

The debtor once owned and operated a grocery store, then sold it to a related party. Later,

the debtor filed for relief under Chapter 7. The trustee filed this adversary proceeding to avoid

certain pre-petition transfers made by the debtor. Some of the transfers that the trustee seeks to

avoid consist of cash transfers made while the debtor was still operating the grocery store. But the

main transfer that the trustee seeks to avoid is the sale of the grocery store itself. In addition to

seeking to avoid these transfers, the trustee also seeks the entry of a money judgment for their value.

After the trial, the Court permitted the parties to file post-trial briefs and then took the case under

advisement.  The case is now ready for decision.  This opinion sets forth the Court's findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052.  For the reasons explained in this opinion, the Court will enter a judgment that denies the trustee's request to avoid the cash transfers, but grants the trustee's request to avoid the transfer of the grocery store.  Further, the Court will enter a money judgment against both defendants for a portion of the value of the avoided transfer.

## Jurisdiction

This is a core proceeding under 28 U.S.C. § 157(b)(2)(H), over which the Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(a) and 157(a).  All of the parties to this adversary proceeding have expressly consented to the Bankruptcy Court entering final orders and judgments in this adversary proceeding, first in the joint Rule 26(f) report filed on November 19, 2012 (ECF No. 9), and then again in the joint final pre-trial order entered on June 17, 2013 (ECF No. 81).  To the extent that a reviewing court concludes that Stern v. Marshall, 131 S. Ct. 2594 (2011) and Waldman v. Stone, 698 F.3d 910 (6th Cir. 2012) prevent this Court from entering a final judgment in this adversary proceeding, notwithstanding the parties' express consent, the Court hereby requests that the reviewing court treat this opinion, and the judgment entered pursuant to the opinion, as proposed findings of fact and conclusions of law, which this Court recommends be adopted by the reviewing court.

## Procedural History

On March 6, 2012, Select One, Inc., d/b/a Farm Fresh Market ("Debtor"), filed this Chapter 7 case.  Charles L. Wells, III ("Trustee") was appointed as the Chapter 7 trustee.  On September 14, 2012, the Trustee filed this adversary proceeding.  The complaint (ECF No. 1) contains four counts for relief against two defendants ("Defendants"), Mike Salmo, a/k/a Mouayad Salmo ("Salmo"), and

Market Fresh Grocery, Inc. ("Market Fresh"), based upon certain cash transfers made by the Debtor to Salmo, and the transfer of the Debtor's grocery store to Market Fresh. The complaint alleges that these transfers are all avoidable as fraudulent transfers, based on various legal grounds.

On March 12, 2013, the Trustee filed a motion for partial summary judgment (ECF No. 41) on count I. The motion dealt only with the transfer of the grocery store and did not address the cash payments. The Defendants filed a timely response. On March 25, 2013, the Trustee filed a motion for summary judgment (ECF No. 50) on count III. This motion also addressed only the transfer of the grocery store, and not the cash payments. The Defendants filed a timely response to this motion as well. On May 23, 2013, the Court issued a bench opinion granting the motions in part and denying them in part. The Court entered two orders on June 3, 2013, to memorialize its rulings.

The first order (ECF No. 76) granted partial summary judgment on count I ("Count I Summary Judgment"). The Count I Summary Judgment found that there are no genuine issues of material fact, and the Trustee is entitled to judgment as a matter of law, with respect to all of the elements of § 548(a)(1)(B) of the Bankruptcy Code, as that statute applies to the transfer of the grocery store, except for the issue of whether the Debtor received less than a reasonably equivalent value in exchange for such transfer. The Count I Summary Judgment also stated that there are no genuine issues of material fact, and that the Trustee is entitled to judgment as a matter of law, with respect to all of the elements of Mich. Comp. Laws Ann. § 566.35(1) and § 544(b)(1) of the Bankruptcy Code, as those statutes apply to the transfer of the grocery store, except for the issue of whether the Debtor received less than a reasonably equivalent value in exchange for such transfer. Reasonably equivalent value was the only issue left for trial under count I with respect to the transfer of the grocery store.

-3-

The second order (ECF No. 77) granted partial summary judgment on count III of the complaint ("Count III Summary Judgment"). The Count III Summary Judgment found that there are no genuine issues of material fact, and that the Trustee is entitled to judgment as a matter of law, with respect to all of the elements of Mich. Comp. Laws Ann. § 566.35(2), as that statute applies to the transfer of the grocery store. The Count III Summary Judgment went on to provide that there are genuine issues of material fact with respect to the date of the transfer of the grocery store for purposes of the one-year statute of limitations in Mich. Comp. Laws Ann. § 566.39(b), leaving that issue for trial.

After the joint final pretrial conference, the Court entered a joint final pre-trial order (ECF No. 81). The joint final pre-trial order preserved the Trustee's requests for relief under counts I through III of his complaint, but stated that the Trustee abandoned his request for relief under count IV. Therefore, only counts I through III of the complaint were tried.

The Court held the trial on June 26 and 27, 2013. The Court heard testimony from six witnesses: Salmo, Sam Denha, Ramy Sesi, Richard Montgomery, Jason Alkamano and Ramiz Sheena. The Court received into evidence the Trustee's exhibits 1 through 26, and the Defendants' exhibits C, E, H and I. After the trial, the Court permitted the filing of post-trial briefs. The Defendants filed a brief, but the Trustee did not. The Court heard closing arguments on July 24, 2013.

## Issues

In each of the complaint's three counts left for trial, the Trustee seeks multiple forms of relief, some under bankruptcy law, and others under state law. The Trustee alleges that both the grocery store transfer and the cash payments were made with actual intent to defraud the Debtor's

-4-

creditors. The Debtor's intent is therefore an issue. The Trustee makes an alternative argument that both the grocery store transfer and the cash payments were constructively fraudulent because they were made while the Debtor was insolvent, and were made for less than reasonably equivalent value. The Count I Summary Judgment and the Count III Summary Judgment did not deal at all with the cash payments, but they did narrow significantly the constructive fraud issues regarding the grocery store transfer. The Count I Summary Judgment and the Count III Summary Judgment found that the Debtor was insolvent at all relevant times. The key issue left open by the Count I Summary Judgment was whether the Debtor received a reasonably equivalent value in exchange for the grocery store transfer. The key issue left open by the Count III Summary Judgment was the date of the grocery store transfer.

Simply stated, the main issues at trial were the Debtor's actual intent in making the grocery store transfer and the cash payments; the date of the grocery store transfer; and whether the Debtor received a reasonably equivalent value for both the grocery store transfer and cash payments.

## Findings of Fact

The Court makes the following findings of fact.

The Debtor is a Michigan corporation formed by Sam Denha. Denha is the sole shareholder of the Debtor. On July 12, 2007, Denha, on behalf of the Debtor, signed an asset purchase agreement (exhibit 1) with the Great Atlantic & Pacific Tea Company Inc. ("A&P") to purchase a grocery store ("Grocery Store") located at 13151 West Ten Mile Road, Oak Park, Michigan. The purchase price was $1 million. At the time of the Debtor's purchase, the Grocery Store had been closed for over a month. For the next three years, the Debtor operated the Grocery Store at a net loss. The Debtor's tax return for 2008 (exhibit 2), showed gross sales of $9,087,286.00, but a loss

-5-

of $556,398.00.  The Debtor's tax return for 2009 (exhibit 2) showed an improvement in the gross

sales to $9,384,086.00, and positive income of $77,294.00.  But the Debtor's tax return for 2010

(exhibit 2) showed that gross sales had declined to $8,614,401.00, and the Debtor suffered a loss that

year of $704,958.00.  The tax returns for these three years all showed that the Debtor was thinly

capitalized with only $1,000.00, but that there were substantial loans made to the Debtor by Denha,

and by his family members and friends, all of which were aggregated on one line on the tax returns

and designated as "loans from shareholders."  The 2008 tax return showed outstanding loans from

shareholders of $1,399,100.00 at the beginning of 2008.  By the end of 2008, the amount owing on

shareholder loans had increased to $1,799,100.00.  The tax returns for 2009 and 2010 showed that

those loans were not paid or reduced by the end of 2010.

On January 9, 2008, the Debtor borrowed $90,000.00 from Denha's nephew, Salmo.  Salmo

and Denha were also involved in other business ventures, including a profitable grocery store that

they owned together.  To evidence the repayment of Salmo's $90,000.00 loan, the Debtor signed a

promissory note ("Salmo Note") (exhibit 3) on January 9, 2008.  The Salmo Note required the

principal sum of $90,000.00 and interest at 8% to be paid to Salmo in one "lump sum" in six months.

To secure the Salmo Note, the Debtor executed a security agreement and UCC financing statement

(exhibit C).  Denha also executed a personal guaranty (exhibit C) of the Salmo Note.

The Debtor did not have the funds to pay the Salmo Note when it matured.  Salmo asked

Denha to pay it, but he did not have the funds either.  Salmo did not threaten or bring a suit against

the Debtor or Denha to collect the Salmo Note.  Instead, he decided to get involved in the operation

of the Grocery Store in an effort to get the Salmo Note paid.  With Denha's full consent, Salmo took

over much of the management of the day to day operations of the Grocery Store beginning in 2009.

-6-

On April 3, 2009, Salmo became an authorized signer on the Debtor's bank account at Citizens Bank (exhibit 6). Salmo then wrote checks both with his own signature and also with a signature stamp that the Debtor maintained for Denha. Sometimes, Salmo wrote checks (exhibit 8) to himself to reimburse expenses he incurred for the Grocery Store. He also made cash withdrawals (exhibit 8) from the Debtor's account from time to time to provide cash for use at the Grocery Store. In addition to being a signatory on the Debtor's bank account, Salmo was also given authority to hire and fire employees, and to sign contracts on behalf of the Debtor.

Despite Salmo's involvement in the Grocery Store, the Debtor still had not paid the Salmo Note by mid-2010. Further, the Debtor was still losing money, and Denha had now run out of any funds to put into the business. The Debtor's 2010 tax return (exhibit 2) clearly showed that the Debtor was insolvent. Denha made some unsuccessful efforts to find a buyer for the Grocery Store, but did not hire a business broker, a real estate broker, or any other professional to assist him. To try to recover his $90,000.00, Salmo suggested to Denha that Salmo take over the Grocery Store and assume the Salmo Note. There were no negotiations over price as Salmo was not willing to pay anything more for the Grocery Store beyond the assumption of the Salmo Note. Denha and Salmo agreed that the Debtor would sell the Grocery Store to Market Fresh, an entity to be formed by Salmo.

To consummate the sale, Denha and Salmo both used the same attorney and accountant. Ramy Sesi was Denha's attorney for many years, and was the Debtor's attorney ever since the Debtor was formed. Sesi was also Salmo's attorney for the last ten years. Both Denha and Salmo signed a conflict of interest waiver to permit Sesi to represent them. Denha and Salmo told Sesi about the agreement they had reached, and asked him to draw up the paperwork. They further

-7-

explained to Sesi that Market Fresh was not bringing any cash to the deal, and that the purchase price would consist solely of the assumption of the Salmo Note. Sesi's role was primarily that of a scrivener, preparing the necessary paperwork for the deal, but not negotiating the price and terms. Both Denha and Salmo trusted Sesi to do the paperwork properly because he had represented both of them for years.

Denha and Salmo also used the same accountant. Jason Alkamano is a certified public accountant who is related as a cousin both to Denha and Salmo. Alkamano had provided tax and accounting services to Denha since 1994 and to Salmo since 2005. Also, Alkamano had worked with Denha in connection with the purchase of the Grocery Store by the Debtor from A&P in 2007, and had prepared the tax returns for the Debtor during all of the years of its existence. Not only had Alkamano provided tax and accounting services to Denha and Salmo, but he also worked in the same building with Sesi and provided tax and accounting services to Sesi and Sesi's law firm for the last several years. Neither Sesi nor Alkamano provided any opinion either to the Debtor or Market Fresh regarding the value of the Grocery Store or the fairness of the proposed sale transaction, although Sesi did tell Salmo that he did not think that Salmo should purchase the Grocery Store, because the rent was too high and the Grocery Store was not making any money.

To document the sale, Sesi drafted an "Agreement of Sale, Purchase Personal Property" ("Purchase Agreement") (exhibit 10). On August 4, 2010, Denha signed it on behalf of the Debtor, and Salmo signed it on behalf of Market Fresh. Neither Denha nor Salmo read the Purchase Agreement before they signed it.

Section 1 of the Purchase Agreement described the property being purchased as including all forms of personal property, including trade fixtures and equipment. Although the Purchase

Agreement stated that the trade fixtures and equipment were described on an exhibit, no such exhibit was prepared or attached. Section 4 of the Purchase Agreement stated that Market Fresh would also purchase the Debtor's "inventory of saleable merchandise." Section 4.1.B. provided that the Debtor and Market Fresh would "employ a mutually agreed upon inventory service company to determine the amount and purchase price" of the inventory.

Section 2.1 of the Purchase Agreement stated that the purchase price was $60,000.00, allocated as follows:

> License, $45,000.00
> Fixtures and equipment, $5,000.00
> Good will, $5,000.00
> Covenant not to compete, $5,000.00.

In addition to the $60,000.00 purchase price described in section 2.1, section 3.1 also provided for an "inventory purchase price of $500,000.00," which brought the total purchase price to $560,000.00. Section 3.1.A. and B. specified that the total purchase price of $560,000.00 would be paid by means of Market Fresh assuming two debts: a $470,000.00 debt owed by the Debtor to Super Value Wholesale ("Super Value") for the inventory in the Grocery Store that the Debtor had purchased from Super Value; plus the $90,000.00 owing on the Salmo Note. The Purchase Agreement did not provide for any cash payment at closing.

Section 11 of the Purchase Agreement set forth various conditions precedent to the obligations of Market Fresh to close. One of those conditions, contained in section 11.1, stated that the obligation of Market Fresh to close was "conditioned upon Purchaser obtaining approval by the MLCC . . . of the transfer of the MLCC . . . License from Seller to Purchaser."[1] Section 11.1.B.

---

[1] "MLCC" refers to the Michigan Liquor Control Commission. This opinion will likewise use these initials.

elaborated that if the assignment of the liquor license by the Debtor to Market Fresh was not approved by the MLCC, then Market Fresh was entitled to "terminate the rights of the Parties under this Agreement." Section 17.1 of the Purchase Agreement provided that the "Closing Date" would occur within 15 days after the MLCC's approval.

After the Debtor and Market Fresh entered into the Purchase Agreement, Market Fresh applied to the MLCC for approval of the transfer of the liquor license. While that process was taking place, the Debtor continued to operate the Grocery Store with Salmo managing the day to day business. Just as he had done prior to the signing of the Purchase Agreement, Salmo continued to write checks on, and make cash withdrawals from, the Debtor's bank account. Altogether, there were seven separate instances, both before and after the Purchase Agreement was signed, where Salmo wrote checks to himself or made cash withdrawals (collectively, the "Cash Transfers") (exhibit 8). The Cash Transfers total $50,155.20.

Alkamano's involvement continued throughout the period of time after the Purchase Agreement was signed, but before MLCC approval. One of the things he did was to help Market Fresh deal with the lease for the Grocery Store. Section 11.94 of the Purchase Agreement conditioned Market Fresh's obligation to close upon "obtaining an Assignment of the Lease." The Purchase Agreement did not define "Lease." However, when the Debtor purchased the Grocery Store from A&P, the asset purchase agreement signed by the Debtor and A&P (exhibit 1) required the Debtor to assume A&P's lease for the premises with Parkwood Plaza Limited Partnership, the owner of the land and building where the Grocery Store was located. The Debtor assumed A&P's lease, but A&P continued to remain liable on the lease. At the time that the Debtor and Market Fresh signed the Purchase Agreement, the Debtor was behind in the rent. Although it is not clear

-10-

from the record precisely how much the Debtor was delinquent at that time, A&P had previously made demand on the Debtor on February 17, 2009 (exhibit 4) for delinquent rent going back to December, 2008. In addition, on December 17, 2009, A&P had filed suit in the United States District Court for the Southern District of New York (exhibit 5) against the Debtor alleging that the Debtor owed past due rent at that time in excess of $706,000.00. Market Fresh never did obtain an assignment of the lease, as required by the Purchase Agreement. Instead, Alkamano helped Salmo negotiate a new lease for Market Fresh, with a reduction in the rent.

Alkamano also worked with Market Fresh during this time to obtain an agreement from Super Value, the wholesale food supplier that had previously sold inventory to the Debtor, to now sell inventory to Market Fresh. To persuade Super Value to do business with Market Fresh, Alkamano prepared projections ("Projections") (exhibit 12) of future operations of the Grocery Store and sent them to Super Value on January 8, 2011. Alkamano prepared monthly and annual Projections for 2011 based upon historical sales records. The Projections broke down expenses by separate line items and assumed new management of the Grocery Store by Salmo, with the terms of the new lease to be entered into by Market Fresh with the landlord. The Projections looked good. They forecast a positive net income of $649,269.20 for the Grocery Store for calendar year 2011. Although Super Value's representative, Dwayne Hazzard, tried to "poke holes" in the Projections, Alkamano defended the Projections because he believed them to be accurate.

Meanwhile, Sesi drew up more paperwork to prepare for closing the sale to Market Fresh. In an effort to meet the MLCC's requirements for approval of the transfer of the liquor license, Sesi drafted an amendment ("First Amendment") (exhibit 11) to the Purchase Agreement. The Debtor and Market Fresh signed it on September 3, 2010. As with the Purchase Agreement, neither Denha

nor Salmo read the First Amendment. Section 1 of the First Amendment did not change the amount of the purchase price, but it did change the method of payment of the purchase price from what was set forth in the Purchase Agreement. In particular, section 3.1.C. of the Purchase Agreement was now amended to state that the "Purchaser shall pay the sum of $50,000.00 in cashier's or certified funds which will be applied toward the purchase of alcoholic inventory." The assumption of the Salmo Note remained the same, but the assumption of the Super Value debt was now reduced by $50,000.00 from $470,000.00 to $420,000.00. Although the Purchase Agreement did not provide for any cash to be paid at closing, the First Amendment now provided for $50,000.00 cash to be paid at closing. The reason for this change was that Sesi believed that the MLCC required a cash payment for any liquor inventory to be transferred at the closing.

While Market Fresh sought MLCC approval of the liquor license transfer, the Debtor continued operating the Grocery Store until mid-January, 2011, when the Debtor ceased operations and closed the Grocery Store. Although the MLCC had not yet approved the transfer of the liquor license, which was a condition to closing in the Purchase Agreement, the Debtor and Market Fresh nonetheless proceeded to close the sale on February 15, 2011 because Salmo intended to reopen the Grocery Store in March, 2011. Sesi prepared a number of closing documents. Denha and Salmo both signed them, but did not read any of them or, for that matter, even know what they said.

One of the February 15, 2011 documents was a second amendment ("Second Amendment") (exhibit 13) to the Purchase Agreement. The Second Amendment made two changes. First, it "estimated" the Debtor's non-alcohol inventory at $30,000.00, although it still stated that such inventory "shall be determined at Seller's then current wholesale cost." Notwithstanding this "estimate," the Second Amendment also required the Debtor to "provide written evidence of . . . [its]

-12-

then-current wholesale cost."  The other change made by the Second Amendment was that there would now be a $5,000.00 cash payment for the alcohol inventory at closing.

At the closing, the Debtor and Market Fresh also signed a settlement statement ("Settlement Statement") (exhibit 14).  The Settlement Statement showed a "Gross Amount" of $90,000.00 due from Market Fresh to the Debtor.  By this time, the Debtor had liquidated much of its non-alcohol inventory in the operation of the Grocery Store and had managed to pay off the Super Value debt.  Therefore, the Settlement Statement did not reflect the assumption of the Super Value debt that was described in the Purchase Agreement.  Instead, the Settlement Statement reflected a total purchase price of only $90,000.00, which it then broke down as follows:

> Fixtures and equipment, $5,000.00
> Good will, $5,000.00
> Covenant not to compete, $5,000.00
> License, $45,000.00
> Inventory, $30,000.00

Denha and Salmo signed two other closing documents on February 15, 2011, both prepared by Sesi.  One of them was a bill of sale ("Bill of Sale") (exhibit 15).  Despite the fact that the Settlement Statement showed a $90,000.00 total purchase price, the Bill of Sale incongruously stated that the consideration for the sale was $60,000.00, plus "the sum of $23,800.00." More importantly, the Bill of Sale falsely stated that the $23,800.00 was paid for the non-alcohol inventory "in cash." At the trial, Denha, Salmo and Sesi all testified unequivocally that no cash changed hands at the February 15, 2011 closing.  The $23,800.00 figure was placed in the Bill of Sale by Sesi, although even he was not sure where that figure came from.

The other closing document was an affidavit of creditors ("Affidavit") (also included in exhibit 15), signed by Denha on behalf of the Debtor.  Like all of the other documents that he

-13-

signed, Denha did not read it or know what it said. The Affidavit stated that as of February 15, 2011, the only creditors of the Debtor consisted of "current taxes and utilities." Denha, Salmo and Sesi all admitted at the trial that the Affidavit, like the Bill of Sale, was false. Denha testified that the Debtor did owe other debts to creditors at that time, including rent to A&P, and a debt to Glacial Energy of Michigan, Inc., which was based upon a contract (exhibit 7) signed for the Debtor by Salmo while he was running the Grocery Store.

Although it was not signed, Denha and Salmo themselves also prepared a document for the February 15, 2011 closing: an inventory list ("Retail Inventory List") (exhibit 16) purporting to identify all of the non-perishable, non-alcohol merchandise in the Grocery Store as of the closing date. The figures on the Retail Inventory List reflect the retail sales price of each of the items of merchandise included, and total $100,224.23. As noted earlier, section 4.1.B. of the Purchase Agreement required the Debtor and Market Fresh to "employ a mutually agreed upon inventory service company to determine the amount and purchase price of the merchandise inventory." And section 4.1.C. provided that the price of the merchandise inventory to be purchased by Market Fresh from the Debtor was the "then-current wholesale cost." Despite these provisions, the Debtor and Market Fresh did not employ an inventory service, and did not identify the "then-current wholesale cost" of the inventory in the Grocery Store on February 15, 2011. Instead of doing what the Purchase Agreement and the Second Amendment required, Denha and Salmo just put together the Retail Inventory List.

After the closing, Market Fresh took possession of the Grocery Store, including all trade fixtures, equipment and inventory, and reopened the Grocery Store for business on March 1, 2011.

On March 31, 2011, the MLCC issued a notice of deficiency ("MLCC Notice") (exhibit 17). The MLCC Notice informed Market Fresh that its "application has been approved by the Liquor Control Commission." However, the MLCC Notice went on to explain that before the liquor license "can be issued to you, the Commission requires all of the items listed below . . . ." Among the items required by the MLCC Notice was a signed bill of sale that conformed exactly to the Purchase Agreement. In addition, the MLCC Notice required a document that showed that Market Fresh had actually assumed the Salmo Note. Sesi put together a package of documents to meet the requirements of the MLCC Notice. But to do so, Sesi had to prepare some new documents to restructure the sale that had closed on February 15, 2011.

Sesi drafted yet another amendment (exhibit 18) to the Purchase Agreement dated April 1, 2011. Despite the fact that there was already a Second Amendment (exhibit 13) that the Debtor and Market Fresh signed when they closed on February 15, 2011, this new amendment was also titled "Second Amendment." (To avoid confusion, the Court will refer to this new amendment as the "April 1, 2011 Second Amendment.") The April 1, 2011 Second Amendment stated that the total purchase price for the sale of the Grocery Store was now $95,000.00, and recited that it was paid by assumption of the Salmo Note, plus the payment of $5,000.00 in cash for alcohol inventory at the closing. To evidence the assumption of the Salmo Note, Sesi drafted, and Market Fresh signed, an "Assumption of Debt" (exhibit 20) that recited that Market Fresh "hereby assumes" the Salmo Note.

Even though the Bill of Sale (exhibit 15) for the Grocery Store had been signed at the February 15, 2011 closing, Sesi now drafted and the Debtor signed another bill of sale ("April 1, 2011 Bill of Sale") (part of exhibit 19). Like the Bill of Sale made on February 15, 2011, the

April 1, 2011 Bill of Sale also contained a false statement regarding the payment of cash at closing, but this time it was in a different amount. The April 1, 2011 Bill of Sale falsely stated that $4,750.00 was paid for alcohol inventory in cash. Denha, Salmo and Sesi all testified at the trial that no cash was paid on April 1, 2011, contrary to what was represented in the April 1, 2011 Bill of Sale. No cash was ever paid, not the amount described in the original Bill of Sale, and not the amount described in the April 1, 2011 Bill of Sale. Salmo delivered the package of April 1, 2011 documents to the MLCC.

To recap, the Debtor and Market Fresh executed closing documents for the sale of the Grocery Store and held the closing on February 15, 2011, although they did so without regard to the terms and conditions of the Purchase Agreement that they had signed. But when the MLCC required additional documents in order to finalize the approval of the transfer of the liquor license by the Debtor to Market Fresh, Sesi prepared a second set of closing documents, dated them April 1, 2011, and had them signed by the Debtor and Market Fresh. Neither Denha nor Salmo read either the February 15, 2011 documents or the April 1, 2011 documents before signing them.

At best, the February 15, 2011 documents and the April 1, 2011 documents are hopelessly inconsistent with one another. At worst, as the Trustee contends, these two sets of conflicting documents, along with a number of other circumstances, demonstrate an intent to defraud. But before considering whether all of these facts, taken together, demonstrate an intent to defraud, the Court first needs to resolve some very specific issues of fact with respect to the Grocery Store transfer. What property did the Debtor transfer to Market Fresh? When did the transfer take place? What was the value of the property transferred? What, if anything, did Market Fresh transfer to the Debtor in exchange?

-16-

After considering and weighing the conflicting and often confusing documents and testimony of the witnesses, the Court finds as a fact that the only property that was transferred by the Debtor to Market Fresh consisted of the trade fixtures, equipment and non-alcohol inventory in the Grocery Store, plus the Debtor's liquor license. The evidence does not establish that any alcohol inventory was ever transferred. The Trustee contends that the date of the transfer was April 1, 2011. The Defendants contend that the date of the transfer was February 15, 2011. The evidence in the record shows that there were two separate dates of transfer: the Debtor transferred the trade fixtures, equipment and non-alcohol inventory on February 15, 2011, and transferred the liquor license on April 1, 2011.

Having determined both *what* property was transferred, and *when* that property was transferred, the Court must next determine the value of the property that was transferred. The Court will first consider the value of the trade fixtures and equipment.[2]

Section 1.1.A. of the Purchase Agreement stated that there was an exhibit to the Purchase Agreement describing the trade fixtures and equipment. But no such exhibit was ever prepared. Neither the Bill of Sale nor the April 1, 2011 Bill of Sale contain a list of the trade fixtures and equipment.

---

[2] Based on the parol evidence rule, the Trustee objected to the admissibility of certain testimony that contradicted the terms of the Purchase Agreement regarding the purchase price and the allocation of that price to the various items of Grocery Store property. The Court heard the testimony, subject to the objection. The Court now overrules the objection. The evidentiary limitation embodied in the parol evidence rule might apply if a party was seeking to enforce a contract in this case. They were not. The trial testimony was not offered for the purpose of varying the terms of the Purchase Agreement, but instead was offered to establish the value of the property transferred pursuant to the Purchase Agreement. The parol evidence rule does not bar this testimony.

The only list of the trade fixtures and equipment in the trial record is a list prepared by Richard Montgomery that he included in an appraisal that he prepared for trial (exhibit 23). Montgomery, an expert witness hired by the Trustee, is a certified auctioneer and a certified personal property appraiser. He has been in the business of providing auction and appraisal services for over 40 years. He has appraised trade fixtures and equipment in 22 different grocery stores over the last six years, and has performed six grocery store auctions of personal property during the same time. Montgomery does not value grocery stores as business enterprises, but instead only appraises and auctions the personal property in grocery stores. He has testified in bankruptcy court and in state court regarding valuations of personal property. Currently, Montgomery spends approximately half of his time appraising personal property.

On January 30, 2013, Montgomery went to the Grocery Store to inspect the trade fixtures and equipment used in the Grocery Store by Market Fresh. Montgomery spent four to five hours inspecting and identifying the trade fixtures and equipment at the Grocery Store. He was accompanied by his assistant and by Salmo. Salmo told Montgomery during the inspection which items of trade fixtures and equipment Market Fresh purchased from the Debtor so that they could be included in his appraisal, and which items were purchased or added by Market Fresh after February 15, 2011, so that they would not be included. Montgomery made a list of the trade fixtures and equipment, but only included those that Salmo told him were part of the purchase by Market Fresh from the Debtor on February 15, 2011. Montgomery also took pictures of the trade fixtures and equipment used by Market Fresh in the Grocery Store. Again, he excluded from his pictures any of the items of trade fixtures and equipment that Salmo told him were either purchased or added by Market Fresh after February 15, 2011. In addition to personally inspecting the trade fixtures and

-18-

equipment, Montgomery reviewed documents provided to him by Salmo and by the Trustee regarding the trade fixtures and equipment. Montgomery prepared a written report (exhibit 23) describing the steps that he took in inspecting the trade fixtures and equipment, and reviewing relevant information about them.

Montgomery's report sets forth three different approaches for valuing the trade fixtures and equipment. All three of Montgomery's approaches estimate a value as of February 15, 2011, the date that the Court has found to be the date of the transfer of the trade fixtures and equipment. Montgomery's report explains that the trade fixtures and equipment sold that date by the Debtor to Market Fresh had a forced sale value of $116,130.00; a fair market value of $187,405.00; and an in-place value of $281,580.00. Montgomery testified that none of these valuations were based upon an income approach, and none of them reflect a going concern value for the Grocery Store. Instead, these estimates of value were made only for the specific items of trade fixtures and equipment that Salmo identified to Montgomery as having been sold by the Debtor to Market Fresh on February 15, 2011.

The Defendants do not dispute the accuracy of Montgomery's list of the trade fixtures and equipment sold by the Debtor to Market Fresh. But Salmo and Denha both dispute all three of Montgomery's estimates of value for the trade fixtures and equipment even though neither Denha nor Salmo ever obtained their own appraisal. Salmo testified that the trade fixtures and equipment were worthless. Denha testified likewise, and described them as "scrap," that would be more expensive to move than to use. But the testimony of each of them was conclusory. They offered little detail or corroborating evidence for their testimony.

To be sure, Salmo did testify that the trade fixtures and equipment were old and in need of repair and maintenance. Further, he testified that Market Fresh had to expend significant amounts, and introduced various bills (exhibit H), for repairs and maintenance of the trade fixtures and equipment after Market Fresh bought the Grocery Store. However, these bills have little if any probative value. Many are illegible. Those that are legible cover a long period of time, but do not indicate any meaningful information about the age and condition of the trade fixtures and equipment on February 15, 2011, the date they were transferred by the Debtor to Market Fresh. Nor was there any testimony at trial that connects these bills to the trade fixtures and equipment or explains whether these bills were incurred because of some particular problem with the trade fixtures and equipment or because of a later decision by Market Fresh either to improve or add to the trade fixtures and equipment that Market Fresh acquired. Exhibit H may establish that Market Fresh received or even paid many bills after the sale. But that's all. Exhibit H is not probative of the value of the trade fixtures and equipment sold by the Debtor to Market Fresh on February 15, 2011, nor does it support Denha's and Salmo's conclusory testimony of value.

The only other testimony that the Defendants offered to support Denha's and Salmo's conclusory testimony about the value of the trade fixtures and equipment was Denha's testimony that he contacted Ramiz Sheena, a used equipment dealer, to see if Sheena was interested in buying the trade fixtures and equipment. Sheena performs remodeling and demolition work for Kroger, and also reconditions and sells trade fixtures and equipment. When Denha contacted him to see if he had any interest in purchasing the trade fixtures and equipment at the Grocery Store, Sheena declined, because he thought that the trade fixtures and equipment were only of scrap value due to their age. Sheena testified credibly that *he* had no interest in purchasing the trade fixtures and

equipment at the Debtor's grocery store. But that fact does not constitute an admissible opinion of the value of the trade fixtures and equipment in the Grocery Store that were sold by the Debtor to Market Fresh.[3]

There is one other document in evidence that arguably pertains to the value of the trade fixtures and equipment. But it does not help the Defendants. Exhibit 21 is a spreadsheet titled Tax Asset Detail 1/01/12 - 12/31/12 for Market Fresh. It was prepared by Alkamano. It states that the "Tax Cost" for the fixtures and equipment acquired on February 15, 2011 was $94,700.00. If anything, this document undercuts the testimony of Denha and Salmo that this property was "worthless" and tends to support the value of such property estimated by Montgomery.

After thoroughly reviewing and carefully weighing all of the evidence in the record, the Court finds that the value of the Debtor's trade fixtures and equipment on February 15, 2011 was $116,130.00. This represents the forced sale value estimated by Montgomery. Although Montgomery's testimony was credible with respect to all three methodologies in his report, the Court considers the forced sale value to be the most accurate and representative value of the Debtor's trade fixtures and equipment on February 15, 2011 for the following reasons.

First, the Debtor's 2010 tax return (exhibit 2) showed that the Debtor had suffered a loss of over $700,000.00 during 2010, and that the Debtor was insolvent on a balance sheet basis. Second,

---

[3] The Defendants sought to qualify Sheena has an expert in valuation. However, the Court declined to permit Sheena to testify as an expert under Federal Rule of Evidence 702 for a number of reasons, including that Sheena's testimony was not based on sufficient facts or data. For example, he only spent 20 minutes total looking at the Debtor's trade fixtures and equipment. Further, his testimony that *he* was not interested in purchasing the trade fixtures and equipment was not the product of any reliable principles and methods, but simply his assessment that he personally could not do anything with the trade fixtures and equipment. Finally, he did not reliably apply any principles and methods to his testimony about the trade fixtures and equipment.

Denha testified that he had run out of money to put into the Debtor to continue its operations. Third, the Grocery Store shut down in January, 2011. Fourth, the Debtor was substantially behind in its rent for the premises, and A&P had both made demand (exhibit 4) and brought suit (exhibit 5) against the Debtor, which ultimately resulted in a judgment against the Debtor in the amount of $823,251.51 (exhibit 26). Fifth, although Denha had not hired a business broker or real estate broker, he had made some efforts to sell the business, and had been unsuccessful. These facts, taken together, prove that the Debtor's sale of the trade fixtures and equipment in the Grocery Store to Market Fresh was in substance a forced sale by a distressed business. The evidence in the record does not warrant the Court adopting either the fair market value or the in-place value estimated by Montgomery. The evidence does not demonstrate that there were any alternative means of sale that could have generated either the fair market value or in-place value. In these circumstances, the Court accepts Montgomery's assessment of the forced sale value of $116,130.00 for the trade fixtures and equipment as of February 15, 2011.

The Court will next consider the value of the non-alcohol inventory that was transferred on February 15, 2011. Section 4.1.B. of the Purchase Agreement stated that the parties would "employ a mutually agreed upon inventory service company to determine the amount and purchase price of the merchandise inventory." They did not do so. Instead of performing the covenants set forth in the Purchase Agreement, the Debtor and Market Fresh signed three different documents on February 15, 2011, all of which are inconsistent with one another and with the Purchase Agreement. The Second Amendment estimated the inventory at $30,000.00, but went on to say that it "shall be determined" at the Debtor's "then-current wholesale cost." Further, the Second Amendment required the Debtor to provide "written evidence" of its "then-current wholesale cost." The

$30,000.00 figure used in the Second Amendment as an "estimate" of the merchandise inventory also appears in the Settlement Statement. But the Bill of Sale from the same date did not use the $30,000.00 figure, and instead used a figure of $23,800.00.

Both Denha and Salmo testified that, regardless of what the closing documents may say, they agreed between themselves that the non-alcohol inventory was only worth $30,000.00. They described that figure as "fair." But neither of them provided any support for that figure or connected it in any way to the one document that they did prepare, the Retail Inventory List, which they each described as showing the actual non-alcohol, non-perishable inventory that was sold.

The Court cannot accept Denha's and Salmo's unsupported testimony that the value of the merchandise inventory was only $30,000.00. Both of them testified in a very conclusory way without any specific information to support their "agreement" that $30,000.00 was "fair." Similarly, the Court must reject the moving target allocations of value given to the non-alcohol inventory in the Second Amendment, Settlement Agreement and Bill of Sale. Sesi's description of some of the figures used in the documents signed by the Debtor and Market Fresh as "plug figures" suggests these figures are arbitrary, and not truly reflective of value.

The most probative evidence in the record about the value of the non-alcohol merchandise inventory sold on February 15, 2011 is the Retail Inventory List prepared by Denha and Salmo. No witness disputed the accuracy of the identification of the items on the list. Salmo testified that he and Denha put this list together by hand for the express purpose of showing the inventory that was transferred at closing. During closing argument, the Defendants' attorney pointed out that there was some testimony that this list included out of date or otherwise unsalable inventory. But neither Denha nor Salmo identified which specific items were out of date or unsalable. Nor did either of

them offer any reason why they would have bothered to list the retail price for each out of date or unsalable item in a hand prepared list that they specifically put together to show what was being sold to Market Fresh on February 15, 2011. The Court accepts the uncontroverted testimony of Salmo that the Retail Inventory List was hand prepared by Denha and Salmo to show what was being sold, but rejects the Defendants' belated contention that the Court should disregard entirely the Retail Inventory List because it may contain some items of merchandise that were either out of date or otherwise unsalable.

Although the Court accepts the accuracy of the items shown on the Retail Inventory List as transferred by the Debtor to Market Fresh, the Court must still determine the value of the items on it. The total of the retail sales price for all of the items shown on the Retail Inventory List is $100,224.23. Denha and Salmo each testified to the approximate amount of the markup of the retail sales price over the wholesale cost. Salmo testified that the approximate markup on the items set forth on this list was 22%. Denha testified that generally, the approximate markup from wholesale cost to retail sales price is 30%. But Salmo testified that the items on the Retail Inventory List were not worth even that much, and instead were only worth $30,000.00, because the list included items that were damaged and other items that were out of date. Denha agreed with Salmo that there were also some items that could not be sold because they were damaged or out of date.

Based on the testimony of Salmo and Denha, the Court finds that the retail sales prices set forth on the Retail Inventory List can be discounted by the approximate markup in the retail sales price to ascertain the wholesale cost. Although Salmo testified to a 22% markup, the Court accepts the 30% markup used by Denha in his testimony. As noted above, both Denha and Salmo testified, albeit without detail, that there were some damaged and expired items of merchandise included on

-24-

the Retail Inventory List. For the reasons explained above, this testimony does not warrant the Court completely disregarding the Retail Inventory List. But this testimony is relevant in assisting the Court in determining which of the two possible markup rates to apply to the items on the Retail Inventory List. Based upon this testimony, the Court finds as a fact that the non-alcohol inventory sold by the Debtor to Market Fresh on February 15, 2011, as shown on the Retail Inventory List, had a wholesale cost at that time of $70,156.96: i.e., the retail sales price of $100,224.23, discounted by 30%. Absent any other evidence in the record of the value of this inventory, the Court finds that the wholesale cost is the best and most probative indicator of the value of such inventory on February 15, 2011.

In addition to the trade fixtures, equipment and the non-alcohol inventory, Market Fresh received other Grocery Store property from the Debtor on February 15, 2011. The Settlement Statement and the Bill of Sale each allocated $5,000.00 of the purchase price to good will, and another $5,000.00 to a covenant not to compete. There is no testimony or other evidence in the record as to the value of either. Given the Debtor's financial distress at the time of the February 15, 2011 closing, the inference is strong that neither of these items had any value. Further, there is nothing in the record to suggest that either the Settlement Statement or the Bill of Sale are reliable indicators of the value of these items. Both of these figures were placed in the Settlement Statement and Bill of Sale without either Denha or Salmo reading those documents. It appears to the Court that these were "plug" figures, to use Sesi's description. Absent any probative evidence of value, the Court finds that there was no value for any good will or covenant not to compete that were transferred to Market Fresh on February 15, 2011.

-25-

The Settlement Statement and Bill of Sale also allocated $45,000.00 of the purchase price to a license. The testimony of Denha and Salmo makes it clear that this $45,000.00 was for the liquor license, as opposed to a lottery license or any other type of license at the Grocery Store. In contrast to the situation with respect to good will and the covenant not to compete, where there is no evidence to show that the allocations of price truly reflect value, Denha and Salmo both testified that there was value in the liquor license. Both of them agreed that the $45,000.00 figure set forth on the Settlement Statement and the Bill of Sale was an accurate reflection of the value of the liquor license. There is no contrary evidence in the record. Unlike their conclusory testimony regarding the value of the trade fixtures, equipment and inventory, which was directly contradicted by other probative evidence in the record, the testimony of Denha and Salmo regarding the value of the liquor license was uncontroverted. The Court therefore accepts their testimony regarding the liquor license and finds that the liquor license had a value of $45,000.00.

Although the Grocery Store was insolvent and getting worse, that does not mean that it had no value. To the contrary, it had demonstrable value. The notion that the Grocery Store was basically worthless, as the Defendants now contend, is not only controverted by the testimony, but is belied by the Defendants' own Projections, which Alkamano prepared for them to show the profits that the Defendants expected in the future from the Grocery Store. The Court finds that the trade fixtures and equipment transferred on February 15, 2011 had a forced sale value on that date of $116,130.00. The Court finds that the Debtor's non-alcohol inventory transferred on February 15, 2011 had a value on that date of $70,156.96. The only other items of property transferred by the Debtor to Market Fresh on February 15, 2011 consist of good will and the covenant not to compete, and the Court finds that they had a zero value on that date. Unlike the trade fixtures, equipment and

non-alcohol inventory, the Debtor transferred the liquor license to Market Fresh on April 1, 2011. The Court finds that the value of the liquor license on that date was $45,000.00. There is no evidence in the record to show that any alcohol inventory was transferred on that date or, for that matter, on any other date.

What did the Debtor receive in exchange for the transfer of the Grocery Store? The Court finds as a fact that Market Fresh did not pay any cash to the Debtor in consideration for the transfer of any of the Debtor's property either on February 15, 2011 or on April 1, 2011. The evidence establishes that the only consideration given by Market Fresh to the Debtor in exchange for any of the Debtor's property transferred to Market Fresh, was the assumption by Market Fresh of the Salmo Note. But the Trustee claims that, as a matter of fact, Market Fresh did not even give that consideration to the Debtor in exchange for the transfer of the Debtor's property for two reasons. First, the Trustee contends that Salmo was an owner of the Debtor and that the $90,000.00 was a capital contribution. Second, the Trustee contends that even if Salmo was not an owner of the Debtor, such that his $90,000.00 was not a capital contribution, but instead was truly a loan, the balance owing on the Salmo Note was reduced by payment of the Cash Transfers. However, the evidence does not support either of these contentions.

The evidence establishes that Denha was the only owner of the Debtor. There is no evidence that Salmo held an equity interest in it. Further, the documents evidencing the Salmo Note (exhibit C) are conventional loan documents, not documents evidencing a capital contribution. The Court finds that Salmo was not an owner of the Debtor at any time, but instead was a creditor of the Debtor in the amount of $90,000.00.

The Court also rejects the Trustee's contention that the Cash Transfers paid down the Salmo Note. Salmo testified that each of the Cash Transfers was for the reimbursement of expenses that he incurred in the operation of the Grocery Store, or to replenish cash at the Grocery Store, or to pay the Grocery Store's rent. The Trustee is correct in noting that Salmo did not produce any documentary evidence to support his use of these funds, and that he stated in his response to the Trustee's request for production of documents (exhibit 25) that such documents do not exist. However, Denha's testimony about the Cash Transfers corroborates Salmo's. There is no contrary evidence in the record to refute Salmo's and Denha's testimony. The absence of written documentation for the Cash Transfers does not outweigh the uncontroverted testimony of Salmo and Denha. The Court finds as a fact that the Cash Transfers were not made to Salmo as payments of the Salmo Note, and did not reduce the balance owing by the Debtor with respect to the Salmo Note.

The Court finds that, in exchange for the transfer of the Grocery Store, the Debtor received a reduction in its liabilities through Market Fresh assuming the Salmo Note.

In sum, the bundle of Grocery Store assets transferred by the Debtor to Market Fresh, whether on February 1, 2011 or on April 1, 2011, had a total value of $231,286.96. That figure breaks down as follows:

| | |
|---|---|
| Trade fixtures and equipment: | $116,130.00 |
| Non-alcohol inventory: | $70,156.96 |
| Liquor license: | $45,000.00 |
| | |
| Total: | $231,286.96 |

The only value given to the Debtor in exchange for these assets was the assumption by Market Fresh of the $90,000.00 Salmo Note. The Court finds that when the Debtor sold the Grocery

-28-

Store to Market Fresh, the Debtor transferred assets having a value of $231,286.96 in exchange for $90,000.00. The difference in the exchange was $141,286.96.

The evidence shows that the Debtor was insolvent when it transferred the Grocery Store to Market Fresh, and that it did so for less than reasonably equivalent value. But did the Debtor intend to defraud its creditors? After carefully reviewing all of the evidence in the record, the Court finds that the Debtor did not make the Property Transfer with actual intent to defraud. The Grocery Store was a failing business that Salmo wished to take over to recoup $90,000.00 he had loaned to it. The evidence shows that Denha was motivated by a desire to help Salmo get paid, but not by an intent to defraud the Debtor's creditors. The Debtor's largest creditor, according to the claims filed in this case (exhibit 26) was A&P, based on the lease for the Grocery Store. But the Purchase Agreement made the assumption of the lease a condition to closing. Moreover, Alkamano and Salmo worked to negotiate a new lease for the premises. The Debtor's second largest debt at the time that the Purchase Agreement was made appears to be the Super Value debt for inventory purchased by the Debtor. Yet the Debtor's operation of the Grocery Store from the date of the Purchase Agreement until the closing enabled the Debtor to pay that debt in full. Denha and Salmo displayed a startling unfamiliarity with the documents they had signed. But that does not mean that the Debtor transferred the Grocery Store with actual intent to hinder, delay, or defraud its creditors.

Unlike the transfer of the Grocery Store, the facts regarding the Cash Transfers are not so complex. There is no dispute that the Cash Transfers were made to Salmo, nor is there any dispute about the amount of the Cash Transfers or the dates they were made. The only factual dispute is what Salmo gave to the Debtor in exchange for the Cash Transfers. Salmo testified without contradiction that he used the Cash Transfers either to reimburse himself for expenses he incurred

on behalf of the Debtor, to provide cash for the Debtor's cash register, or to pay the Debtor's bills. Absent any evidence to the contrary, the Court finds that Salmo did give value to the Debtor for the Cash Transfers by using them to pay the Debtor's debts. The only evidence in the record about the Cash Transfers tends to support Salmo's testimony that the Cash Transfers were made in the ordinary course of the Debtor's business to reimburse expenses, provide cash for the operation of the Grocery Store, or pay the Debtor's debts. The Trustee is correct that Salmo did not produce documents during discovery to corroborate his explanation regarding the Cash Transfers. But that is not, by itself, sufficient to prove that the Debtor made the Cash Transfers with intent to defraud.

### Conclusions of Law

The Court makes the following conclusions of law.

### Count I

Count I of the Trustee's complaint seeks to avoid the Cash Transfers and what is referred to as the "Property Transfer,"[4] under both § 548(a)(1)(A) and (B) of the Bankruptcy Code, and Mich. Comp. Laws Ann. § 566.34(1)(a) and (b), and § 566.35(1). The Court will consider them in sequence.

Section 548(a)(1)(A) provides that a trustee may avoid any transfer of an interest of the debtor in property made within two years before the date of the filing of the petition if the debtor voluntarily or involuntarily "made such transfer . . . with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made . . .

---

[4] Basically, the complaint's reference to the "Property Transfer" is identical to what the Court has referred to as the transfer of the Grocery Store, consisting of the Debtor's trade fixtures, equipment, inventory and liquor license. Therefore, in this part of the opinion, the Court will refer to the Debtor's transfer of the Grocery Store items of property collectively as the Property Transfer.

-30-

indebted." This is commonly referred to as avoidance of a transfer based on actual fraud. The Trustee contends that both the Property Transfer and the Cash Transfers were made with actual intent to hinder, delay, or defraud the Debtor's creditors.

As explained in the findings of fact, the Court has found that the Trustee failed to prove that either the Property Cash Transfer or the Cash Transfers were made with actual intent to hinder, delay, or defraud creditors, which is a required element under § 548(a)(1)(A) of the Bankruptcy Code. Therefore, to the extent that count I of the Trustee's complaint seeks relief under that section of the Bankruptcy Code, the Court will deny such relief.

But count I of the Trustee's complaint also seeks relief under § 548(a)(1)(B) of the Bankruptcy Code. Section 548(a)(1)(B) provides that a

> trustee may avoid any transfer . . . of an interest of the debtor in property . . . made . . . within 2 years before the date of the filing of the petition if the debtor voluntarily or involuntarily . . . received less than a reasonably equivalent value in exchange for such transfer . . . and was insolvent on the date that such transfer was made . . . .

This is commonly known as constructive fraud. It requires no evidence of fraudulent intent. The Count I Summary Judgment found that all of the elements of § 548(a)(1)(B) are present with respect to the Property Transfer, except for one: whether the Debtor "received less than a reasonably equivalent value in exchange for" the Property Transfer. The issue of reasonably equivalent value, which was the only issue left for trial by the Count I Summary Judgment as to the Property Transfer, is also an issue for the Cash Transfers.

The Bankruptcy Code does not define reasonably equivalent value. "[B]ecause considerations of valuation are inherently factual, courts must examine the case-specific circumstances surrounding the decision to enter into the challenged transaction." <u>Bankeast v.</u>

Shirley (In re Shirley), Nos. 10-3031, 10-3032, 2011 WL 4054773, at *8 (Bankr. E.D. Tenn. Sept. 12, 2011) (citation omitted). "[A] dollar-for-dollar equivalent is not required" for reasonably equivalent value." Id. (citing Corzin v. Fordu (In re Fordu), 201 F.3d 693, 707 (6th Cir. 1999)). "In assessing this value, courts generally consider many factors, including the good faith of the parties, the disparity between the fair value of the property and what the debtor actually received, and whether the transaction was at arm's length." Onkyo U.S.A. Corp. v. Global Technovations, Inc. (In re Global Technovations, Inc.), No. 10-12781, 2011 WL 1297356, at *5 (E.D. Mich. Mar. 31, 2011) (internal quotation marks and citation omitted).

Although the case law permits the Court to consider many factors in assessing reasonably equivalent value, the evidence in this case, perhaps unlike some others, allows the Court to readily calculate in dollars the disparity between what was given and what was received with a high degree of precision. As explained in the findings of fact, the Property Transfer had a value of $231,286.96. The only value received by the Debtor in exchange for the Property Transfer was the assumption of the $90,000.00 Salmo Note.[5] The difference is $141,286.96. There are no other factors present in this case that diminish the importance of this dollar differential. The Court concludes that the Debtor did not receive reasonably equivalent value in exchange for the Property Transfer. Therefore, the Trustee is entitled to relief under § 548(a)(1)(B)(i).

---

[5] The Trustee contends that assumption of a debt cannot constitute reasonably equivalent value, citing Suhar v. Bruno (In re Neal), 478 B.R. 261 (B.A.P. 6th Cir. 2012). The Court disagrees. As stated by the Suhar v. Bruno court, "[i]n determining whether a debtor received reasonably equivalent value, assets less liabilities assumed by the recipient of the assets may be an appropriate formula to consider." Id. at 273 (citation omitted). Further, "the assessment and calculations are fact driven . . . ." Id. at 273-74 (finding under the facts in that case that the assumption of credit card debt did not confer any value because the assuming party was solely responsible for that debt). In this case, Market Fresh's assumption of the Salmo Note conferred a benefit on the Debtor, but only to the extent of $90,000.00.

12-05664-pjs    Doc 92    Filed 08/12/13    Entered 08/13/13 08:19:41    Page 32 of 41

However, the Court concludes that the Debtor did receive a reasonably equivalent value in exchange for the Cash Transfers. The reasonably equivalent value for the Cash Transfers received by the Debtor was the reimbursement of expenses incurred by Salmo, providing the Grocery Store with cash to operate, and paying the debts of the Debtor. To the extent that count I requests avoidance of the Cash Transfers under § 548(a)(1)(B)(i), the Court will deny such relief.[6]

The Trustee also asks for relief under count I for actual and constructive fraud based on state law, using his strong arm powers through § 544(b) of the Bankruptcy Code. Section 544(b) provides that a "trustee may avoid any transfer of an interest of the debtor in property . . . that is voidable under applicable law by a creditor holding an unsecured claim . . . ." The Michigan Uniform Fraudulent Transfer Act, similar to § 548 of the Bankruptcy Code, contains both an actual fraud provision and a constructive fraud provision. Mich. Comp. Laws Ann. § 566.34(1)(a) provides that a transfer is fraudulent if made with actual intent to hinder, delay, or defraud a creditor of the debtor. In determining actual intent under this state law provision, the Court may consider a number of factors, commonly known as badges of fraud, listed in Mich. Comp. Laws Ann. § 556.34(2). "'Badges of fraud are not conclusive, but are more or less strong or weak according to their nature and the number concurring in the same case, and may be overcome by evidence establishing the bona fides of the transaction.'" Bentley v. Caille, 286 N.W. 163, 164 (Mich. 1939) (quoting Timmer v. Pietrzyk, 261 N.W. 313, 314 (Mich. 1935)).

As for the Property Transfer, there are some badges of fraud. The Property Transfer was made to an insider, and consisted of substantially all of the Debtor's assets. At the time of the

---

[6] Because the Court has determined that the Debtor received reasonably equivalent value in exchange for the Cash Transfers, the Court need not reach the other elements of § 548(a)(1)(B) as to the Cash Transfers.

-33-

Property Transfer, the Debtor had been sued, and the Debtor was insolvent. Both the Debtor and Market Fresh used the same attorney and accountant. On the other hand, the Property Transfer was not concealed.[7] The Debtor and the Defendants did not abscond, nor did they remove or conceal assets. Funds were not diverted to other parties or insiders. A significant debt was paid down during winding up of the operations of the Grocery Store. Even though the Debtor and Market Fresh used the same professionals, there is no testimony or other evidence that the Debtor or Market Fresh conspired with them to defraud the Debtor's creditors. Although some of the badges of fraud are present in this case, when weighed with all of the evidence in this case, they are not enough for the Court to conclude that the Trustee has proven actual intent to defraud with respect to the Property Transfer.

There are even fewer badges of fraud with respect to the Cash Transfers. It is true that Salmo was an insider. But there is no evidence that the Debtor or Salmo concealed the Cash Transfers. Nor did the Cash Transfers consist of substantially all of the Debtor's assets. The Debtor and Salmo did not abscond after the Cash Transfers were made. The Cash Transfers were not made either shortly before or after a substantial debt was incurred. There are not sufficient badges of fraud for the Court to conclude that the Cash Transfers were made with actual intent to defraud.

For constructive fraud under state law, the Trustee again relies on his Bankruptcy Code § 544(b) strong arm powers, and Mich. Comp. Laws Ann. § 566.34(1)(b) and § 566.35(1). The Trustee's proofs and arguments at trial did not focus on § 566.34(1)(b), and instead concentrated on

---

[7] The Trustee argued that Salmo and Denha concealed the Property Transfer, but only during the discovery process in the bankruptcy case and in this adversary proceeding. There is no evidence in the record that the Property Transfer was concealed at the time of the actual transfer.

-34-

§ 566.35(1). As for the Property Transfer, the Count I Summary Judgment found in favor of the Trustee on all elements of § 566.35(1) except for the issue of whether the Debtor received less than reasonably equivalent value in exchange for the transfer. Like the Bankruptcy Code, the Michigan Uniform Fraudulent Transfer Act does not define reasonably equivalent value. As interpreted by the case law, reasonably equivalent value under the Michigan statute is substantially the same as under the Bankruptcy Code. See Allard v. Flamingo Hilton (In re Chomakos), 69 F.3d 769, 770 (6th Cir. 1995) (applying a prior version of the Act, which required "fair consideration"). For the reasons discussed above, in the Court's analysis of § 548(a)(1)(B)(i) of the Bankruptcy Code, the Court holds that the Debtor did not receive a reasonably equivalent value for the Property Transfer, but did receive a reasonably equivalent value for the Cash Transfers. Therefore, all of the elements of Mich. Comp. Laws Ann. § 566.35(1) are present with respect to the Property Transfer, but not with respect to the Cash Transfers. Given the absence of proofs and argument at trial, the Court concludes that the Trustee is not entitled to avoid either the Property Transfer or the Cash Transfers under § 566.34(1)(b). In sum, the Trustee is entitled to avoid the Property Transfer under Mich. Comp. Laws Ann. § 566.35(1) but is not entitled to avoid the Cash Transfers under either § 566.34(1)(b) or § 566.35(1).

## Count II

In count II of the complaint, the Trustee seeks a turnover of the balance of the purchase price for the Property Transfer. The Court holds that the Trustee is not entitled to any recovery under count II. Regardless of whether the Court turns to the February 15, 2011 closing documents or the April 1, 2011 set of documents, the only purchase price for the Property Transfer was the assumption of the $90,000.00 Salmo Note. Market Fresh signed the Assumption of Debt

-35-

(exhibit 20) agreeing to assume the Salmo Note on April 1, 2011. There is no unpaid purchase price. Therefore, the Trustee is not entitled to any recovery under count II.

Count III

In count III of the complaint, the Trustee does not seek any relief with respect to the Cash Transfers, but only seeks relief with respect to the Property Transfer. Here, the Trustee relies on § 544(b) of the Bankruptcy Code to avoid the Property Transfer under another Michigan statute: Mich. Comp. Laws Ann. § 566.35(2). Section 566.35(2) provides that "[a] transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent."

The Count III Summary Judgment found that there are no genuine issues of material fact on any of the elements of Mich. Comp. Laws Ann. § 566.35(2), with one exception: the *date* of the Property Transfer. Under Mich. Comp. Laws Ann. § 566.39(b), the Trustee may only obtain recovery under Mich. Comp. Laws Ann. § 566.35(2) if the transfer to be avoided was made within one year before the Debtor's bankruptcy case. The Court has now determined the date of the transfer. There were two dates. The trade fixtures, equipment and non-alcohol inventory were all transferred on February 15, 2011. That is more than one year before the Debtor's bankruptcy petition. Under § 566.39(b), the cause of action under § 566.35(2) is therefore extinguished as to the transfer of the trade fixtures, equipment and non-alcohol inventory. However, the same is not true with respect to the liquor license. The Debtor transferred the liquor license to Market Fresh on April 1, 2011. That is within one year before the Debtor's bankruptcy petition was filed. Therefore, the Trustee is entitled to avoid the transfer of the liquor license. Accordingly, the Court will enter

a judgment in the Trustee's favor avoiding the transfer of the liquor license under Mich. Comp. Laws Ann. § 566.35(2) and § 544(b) of the Bankruptcy Code.

Section 550(a)(1)

The Court has held that the Cash Transfers may not be avoided by the Trustee, but that the Property Transfer is avoidable under § 548(a)(1)(B)(i) of the Bankruptcy Code, and § 566.35(1) of the Michigan Uniform Fraudulent Transfer Act, through § 544(b) of the Bankruptcy Code. The Court has also held that the liquor license transfer is independently avoidable under Mich. Comp. Laws Ann. § 566.35(2) and § 544(b) of the Bankruptcy Code. However, in addition to requesting the avoidance of such transfers, the Trustee also requests a money judgment against both of the Defendants for the value of the avoided transfers.

Section 550 of the Bankruptcy Code governs the liability of a transferee of avoided property. Section 550(a)(1) provides that to the extent that a transfer is avoided, the Trustee may recover for the estate the property transferred or, "if the court so orders, the value of such property from the initial transferee of such transfer or the entity for whose benefit such transfer was made." This statutory provision recognizes that "avoidance and recovery are distinct concepts and processes." Suhar v. Burns (In re Burns), 322 F.3d 421, 427 (6th Cir. 2003). Moreover, the statute further recognizes that there is a difference between recovery of the transferred property itself, and recovery of the value of the transferred property. By providing these different remedies, § 550(a)(1) serves the purpose of "'restor[ing] the estate to the financial condition it would have enjoyed if the transfer had not occurred.'" Suhar v. Bruno (In re Neal), 478 B.R. 261, 273 (B.A.P. 6th Cir. 2012) (quoting Hirsch v. Gersten (In re Centennial Textiles, Inc.), 220 B.R. 165, 176 (Bankr. S.D.N.Y. 1998)).

-37-

Market Fresh is the initial transferee of the Property Transfer and is, therefore, within § 550(a)(1). Further, the evidence indisputably establishes that Salmo was the person for whose benefit the Property Transfer was made. The entire Property Transfer was made solely to permit Salmo to try to get the Salmo Note paid. As a result, Salmo is also within § 550(a)(1) of the Bankruptcy Code. That means that the Court may properly consider each of the remedies authorized by § 550(a)(1).

"'Neither the statute nor the legislative history gives any guidance as to when the court should order a transferee or a beneficiary of a transfer to pay over the value of the property transferred.'" Gennrich v. Montana Sport U.S.A., Ltd. (In re International Ski Service, Inc.), 119 B.R. 654, 656 (Bankr. W.D. Wisc. 1990) (quoting Vern Countryman, The Trustee's Recovery in Preference Actions, 3 Bankr. Dev. J. 449, 467 (1986)) (other citations omitted). Courts have considered many factors, including whether the record contains sufficient evidence of the value of the property; whether the evidence as to value is conflicting; whether the property is unrecoverable, for example, when the property consists of fungible goods; whether the property has appreciated or depreciated in value; and whether the defendant used and consumed the property. Id. at 657-59 (collecting and discussing cases); see also Slone v. Lassiter (In re Grove-Merritt), 406 B.R. 778, 812 (Bankr. S.D. Ohio 2009) (finding that the estate would not be fully restored by burdening the trustee with selling the property in the middle of an economic downturn). Once a court has determined to enter a money judgment for the value of the property, "'what value to award [pursuant to § 550(a)] is left entirely to the court's discretion.'" Suhar v. Bruno, 478 B.R. at 273 (quoting Meoli v. The Huntington Nat'l Bank (In re Teleservices Grp., Inc.), 469 B.R. 713, 765 (Bankr. W.D. Mich. 2012)).

-38-

In this case, Market Fresh took over the Grocery Store on March 1, 2011, nearly 2-1/2 years ago, and has been operating it since that time. Salmo's own testimony and the Market Fresh tax return (exhibit 22) show that Salmo has been losing money operating the Grocery Store. Further, Salmo contends that there have been many bills and expenses incurred with respect to the ownership of the trade fixtures and equipment during that time (exhibit H). In these circumstances, the Court concludes that the bankruptcy estate would not be fully restored by simply getting the Property Transfer back. Instead, the Court finds that a money judgment for the value of the Property Transfer is necessary to make the estate whole.

Although the Trustee's complaint seeks a money judgment for all of the value of the transferred property, at closing argument, the Trustee modified his request for a money judgment. Specifically, the Trustee now requests that, if the Court avoids the transfer of the liquor license, then the recovery of the liquor license for the bankruptcy estate renders a money judgment for the value of the liquor license unnecessary. But as to any other portion of the Property Transfer that is avoided, the Trustee renews his request for a money judgment.

The Court concludes that the proper remedy in this case, to make the estate whole for the avoidance of the Property Transfer, is to grant the Trustee's request for a money judgment for part of the value of the avoided transfer, and grant the Trustee's request for recovery of the other portion of the avoided transfer. Pursuant to § 550(a)(1) of the Bankruptcy Code, the Court awards the Trustee recovery of the liquor license. Pursuant to § 550(a)(1), the Court also awards the Trustee a money judgment of $96,286.96 against both Defendants. The Court arrives at that sum by starting with the total value of the Property Transfer (i.e., $231,286.96), reducing that total value by the

amount of the assumed Salmo Note (i.e., $90,000.00), and then further reducing it by the value of the liquor licence (i.e., $45,000.00).

Finally, the Defendants argue in their post-trial brief that the Court should look to the Michigan Uniform Fraudulent Transfer Act in determining the proper remedy if it rules in favor of the Trustee. But the Trustee only resorted to Michigan law in exercising his strong arm powers to avoid the Property Transfer under § 544 of the Bankruptcy Code. The Trustee did not ask for a remedy under Michigan law. Instead, the complaint requests a money judgment to recover the value of the avoided transfers be recovered under § 550(a) of the Bankruptcy Code. Therefore, the Court declines to impose any limit on the remedy based on Michigan law.

## Conclusion

Although the documents and testimony were often confusing, the short version of the facts in this case is relatively straight forward. The Debtor purchased the Grocery Store for $1,000,000.00. After only a few years of operation, it was losing money and was insolvent. The Debtor was unable to pay its rent, unable to pay its creditors, and its owner, Denha, had no more money to put into it. The Debtor owed Denha's nephew, Salmo, $90,000.00. To try to recoup the $90,000.00, Denha and Salmo agreed that Salmo would form an entity to purchase the Grocery Store and take it over. Denha and Salmo used the same professionals to put the transaction together. They told those professionals the basic terms of their deal, and trusted them to do the documents. Neither of them read, understood or were familiar with the contents of the documents, so they basically did what they wanted to close the deal. They signed the Purchase Agreement on August 4, 2010; closed the sale of the personal property of the Grocery Store on February 15, 2011; and eventually transferred the liquor license on April 1, 2011, after the MLCC gave its approval of the transfer.

There were two sets of documents, with different dates, but it is clear from the record that the April 1, 2011 documents were prepared solely to satisfy a perceived requirement of the MLCC. They not have any other probative value.

Both Denha and Salmo lacked a great deal of information about the Grocery Store transfer. Much of their testimony was conclusory and unsupported. But the Court was not left with the impression that they are dishonest. More importantly, the Court is not persuaded that the Debtor acted with actual intent, to hinder, delay, or defraud its creditors. But the Court is persuaded that the Debtor transferred the Grocery Store to Market Fresh for less than reasonably equivalent value at a time when the Debtor was indisputably insolvent. That is constructive fraud. The Trustee is entitled to an order avoiding that transfer. The difference in the value of the property exchanged was $141,286.96. The Trustee is entitled to a remedy that will make the estate whole. In this case, that means recovery of the liquor license (having a value of $45,000.00) and entry of a money judgment for $96,286.96 against both Defendants. The Court will enter a separate order granting such relief in favor of the Trustee.

**For publication**

.

Signed on August 12, 2013

                                    /s/ Phillip J. Shefferly
                              Phillip J. Shefferly
                              United States Bankruptcy Judge

-41-